UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 15-tp-20087-KMM/Becerra

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

HORACE MILTON BLACK,

    Defendant.
_____/

### REPORT AND RECOMMENDATION[1]
### ON PETITION FOR REVOCATION OF SUPERVISED RELEASE

THIS MATTER arose on a Petition for Revocation of Supervised Release (the "Petition") filed against Defendant Horace Milton Black ("Defendant" or "Black"). ECF No. [16]. With Defendant's consent to proceed by videoconference, an evidentiary hearing was held before the undersigned. Thereafter, counsel filed their respective Proposed Findings of Fact and Conclusions of Law. ECF Nos. [54], [56]. For the reasons set forth below, the undersigned **RECOMMENDS** that the Petition be **GRANTED** as to Violation 3, **DENIED** as to Violation 4, and that Violations 1 and 2, as lesser included offenses of Violation 3, be **DISMISSED**.

**I.    BACKGROUND**

On April 14, 2005, Defendant was sentenced in the Middle District of Alabama to 140 months of imprisonment to be followed by five years of supervised release for armed robbery and aiding and abetting armed robbery. ECF No. [1]. The case was transferred to the Southern District of Florida on November 24, 2015. *Id.* On January 19, 2016, the Court, at the request of Defendant's Probation Officer and with Defendant's consent, added location monitoring for a

---

[1] The Honorable K. Michael Moore, Chief United States District Judge, referred this matter for all necessary and proper action with respect to any and all violations of supervised release. ECF No. [21].

period of 120 days to his conditions of supervised release. ECF No. [2]. The request to add location monitoring was made as a result of two violations of the standard conditions of release: (1) leaving the judicial district and traveling to Orlando, Florida without permission from his Probation Officer; and (2) failing to answer the Probation Officer's questions truthfully. *Id.* at 2. Those two violations arose when Defendant was stopped by law enforcement in Orlando and one of the occupants in the car was arrested for carrying a concealed firearm. *Id*.

On March 21, 2017, his Probation Officer again petitioned the Court for a modification of his supervised release terms based on three violations: (1) leaving the judicial district and traveling to Sanford, Florida without permission from his Probation Officer; (2) failing to notify his probation officer within seventy-two hours that he has been arrested or questioned by law enforcement; and (3) failing to refrain from violation of law by driving with a suspended license. ECF No. [3]. On April 27, 2017, the Court found that Defendant violated the terms of his supervised release and reinstated the period of supervised release. ECF No. [14].

## II.  THE PENDING PETITION FOR REVOCATION

On September 19, 2019, Probation filed the instant Petition based on Defendant's arrest on September 9, 2019 in Volusia County, Florida. ECF No. [16]. The Petition charged the Defendant with four (4) violations, each of which corresponds to a violation of law, as follows:

Violation 1:   Trafficking in cocaine, in violation of Florida Statute 893.135.1b1

Violation 2:   Cocaine possession, in violation of Florida Statute 893.13.6a

Violation 3:   Cocaine possession with intent to sell, in violation of Florida Statute 893.13.1a1

Violation 4:   Possession of Drug Paraphernalia, in violation of Florida Statute 893.13.1a1.

### III.   THE EVIDENTIARY HEARING AND FINDINGS OF FACTS

The government presented the testimony of the following witnesses during the evidentiary hearing: (1) Florida Highway Patrol Trooper, Rickie Zigler, (2) Florida Department of Financial Services Detective, Edy Rivera, (3) Florida Department of Law Enforcement Crime Lab Analyst, M. Jillian Kishazy, and (4) Jacksonville Sheriff's Officer, William Campbell.  ECF Nos. [48], [49].  In addition to this testimony, the government also entered the following exhibits into evidence: (1) a video taken on the night of Defendant's arrest from the dash camera on Trooper Zigler's patrol car (Gov. Exh. 1); (2) photographs of items seized on the night of Defendant's arrest (Gov. Exh. 2A-2J, filed at ECF No. [57-1]); (3) recordings of intercepted phone calls (Gov. Exhs. 3-9); and the corresponding transcripts of the submitted, intercepted calls (Gov. Exh. 3T-9T, filed at ECF No. [57-2]).  ECF No. [48], [49].  The Court credits the testimony of the government's witnesses and summarizes the pertinent portions of that testimony below.

#### A.  **Trooper Zigler**

On September 9, 2019, Trooper Zigler received information from other law enforcement officers about a vehicle that was traveling on Interstate 4.  Defendant was the driver and only occupant of the vehicle.  Trooper Zigler testified that he conducted a traffic stop of the vehicle when he observed that the vehicle was traveling at a speed of approximately fifty miles per hour in a seventy mile-per-hour zone.  In addition to driving below the speed limit, Trooper Zigler testified that Defendant veered the car in front of another car, forcing the driver of that car to brake suddenly in order to avoid a collision on the highway.  Trooper Zigler's vehicle was equipped with a dash camera and video footage from that camera confirmed Trooper Zigler's testimony that Defendant's vehicle veered in front of another car.  Trooper Zigler activated his emergency lights to stop Defendant for the traffic infraction.  The timestamp on the video indicates that the traffic stop took place at approximately 11:05 p.m.

Once the vehicle stopped, Trooper Zigler approached the front passenger window of the vehicle and asked Defendant, who was the driver and the only occupant, for the vehicle's registration and insurance documents. While standing near the front passenger window, Trooper Zigler detected a strong odor of marijuana and observed marijuana residue or crumbs in the center console of the vehicle. Defendant informed Trooper Zigler that the vehicle was registered to a family member and that he was heading to visit his girlfriend in Deland, Florida.

Trooper Zigler asked Defendant to exit the vehicle and informed him that he detected the odor of marijuana coming from inside the car. Defendant responded that he had smoked marijuana earlier that day. The dash camera recorded the conversation, including Defendant's statements. Trooper Zigler asked Defendant to wait inside the backseat of his patrol car while he searched the car that Defendant was driving.

Upon starting the search, Trooper Zigler found marijuana crumbs in the center console of the car. When he found the marijuana, Trooper Zigler stated "crumbs" which is audible in the dash camera recording. A few minutes later, Trooper Zigler focused his search on the front passenger seat area. Underneath the passenger seat, and within arm's reach of the driver's seat, Trooper Zigler found a plastic shopping bag with two larger bags containing a white powdery substance. *See* Govt. Exhs. 2B, 2I, 2J at ECF No. [57-1]. Trooper Zigler can be heard to say "looks like cocaine" on the dash camera video at the time he found the two larger bags.

The white powdery substance inside the two larger bags was field tested with a Tru-Narc device and was positive for cocaine. Along with the two larger bags that contained the cocaine, Trooper Zigler also found three small plastic baggies. One baggie contained a white powdery substance, the second contained a tan powdery substance, and the third baggie contained two blue pills. The contents of the three small baggies were also field tested but the results as to each were inconclusive.

4

B. **Detective Rivera**

Detective Rivera assisted Trooper Zigler during the search of Defendant's vehicle and subsequent arrest of Defendant. Detective Rivera testified that on September 9, 2019, he received information from the Jacksonville Sheriff's Office ("JSO") about a potential cocaine transaction. That information included information about a vehicle, later identified as the vehicle that Defendant was driving at the time of his arrest. He communicated the information about the vehicle, including the make and tag number, to Trooper Zigler.

Detective Rivera testified that he arrived on the scene a few minutes after Trooper Zigler conducted the traffic stop. Detective Rivera was with a police canine who is trained to detect marijuana, cocaine, heroin, and methamphetamine. Detective Rivera took the police dog to the passenger's side of Defendant's vehicle and the police dog immediately alerted to the front passenger door area. The dash camera video from Trooper Zigler's vehicle recorded the police dog's response, showing the dog jumping and moving toward the front passenger door of Defendant's vehicle.

Detective Rivera also assisted Trooper Zigler's search of the vehicle. Within a few minutes of beginning the search, Detective Rivera heard Trooper Zigler announce that he had found cocaine. Detective Rivera testified that Trooper Zigler found a plastic shopping bag with two large bags of suspected cocaine, and three much smaller bags of what appeared to be a white powder, a tan powder, and two pills. Detective Rivera and Trooper Zigler then weighed the two bags, which had a combined weight of over 530 grams. *See* Govt. Exh. 2C at ECF No. [57-1]. Detective Rivera could not recall exactly who tested the contents of the two larger bags, but he confirmed that the test was performed on scene and that the contents tested positive for cocaine. *See* Govt. Exh. 2A at ECF No. [57-1]. Detective Rivera also testified that the two larger bags had

a distinctive stamp of cartoon figures from the children's television show Paw Patrol. *See* Govt. Exh. 2I at ECF No. [57-1].

Detective Rivera testified that he had extensive experience investigating narcotics violations and has been trained in topics relevant to narcotics investigations, including drug amounts consistent with sale or distribution. He testified that, based on his training and experience, the amount of cocaine found in Defendant's vehicle was inconsistent with personal use and is indicative of distribution.

C. **Forensic Chemist Jillian Kishazy**

Crime Lab Analyst Kishazy is a forensic chemist who testified that she tested the drugs seized from under the front passenger's seat of Defendant's vehicle and that those tests confirmed that the substance in those bags was cocaine. She also testified that she recalled the Paw Patrol markings on the exterior of the two plastic bags. Finally, she testified that the contents of the two bags weighed a little over 530 grams.

D. **William Campbell**

Officer Campbell testified that in the months prior to Defendant's traffic stop he had been conducting a large narcotics investigation which included, among other things, multiple wiretap intercepts, hundreds of intercepted telephone calls, and the use of informants and visual surveillance. In connection with that investigation, Officer Campbell learned that two targets were planning to execute the sale of a half-kilogram of cocaine on the night of September 9, 2019. The two targets were a man identified as Roosevelt Lewis, who was brokering the sale, and a second individual who he identified as UM 9, who was the person supplying the cocaine to Lewis. Although Officer Campbell concluded, after Trooper Zigler's traffic stop, that Defendant was UM 9, Defendant's identity was not known to Officer Campbell before the traffic stop.

Officer Campbell testified that as part of this narcotics investigation, law enforcement had monitored a meeting at a Wendy's restaurant between Lewis and UM 9. Although law enforcement was not able to identify UM 9 at that time, they were able to see the license plate of the vehicle the he was driving. Using the license plate number and GPS data from the telephone associated with UM 9, law enforcement was able to identify a residence where they believed UM 9 was staying. The cellular telephone that was associated with UM 9 had a 321-area code.

On September 9, 2019, Officer Campbell testified about a recorded conversation between Lewis and UM 9. That recording included the following exchange:

Lewis: […] yea he said if you do it like that he snatch the halfway.

Black: Oh halfway, you talking about with the girl right?

Officer Campbell testified that "girl" was a coded reference to cocaine, while "halfway" refers to the quantity of cocaine: a half-kilogram. Based on that call, law enforcement believed that UM 9 was going to supply Lewis with half a kilogram of cocaine.

On September 9, 2019, law enforcement set up surveillance at the residence associated with UM 9. At the residence was the vehicle that had been seen at the Wendy's restaurant meeting. Law enforcement followed the vehicle when it left the residence by using the license plate number and GPS data from UM 9's cellular telephone. Law enforcement had secured real time location information for that telephone and was being used by the person inside the vehicle based on that location information. Officer Campbell's team provided information about the vehicle to the Florida Highway Patrol ("FHP") and advised that they believed, based on intercepted calls earlier in the day, that the vehicle contained narcotics. Officer Campbell testified that he and his surveillance team were in contact with the FHP throughout the night, including during the traffic stop that Trooper Zigler conducted.

At 11:06 p.m. on September 9, 2019, a man identified as UM 9 and using the cellular telephone with the 321-area code, called Lewis and told him that: "Bro they got me pulled bro give me a minute I'll call ya." *See* Govt. Exh. 9 at ECF No. [57-2]. This call takes place less than a minute after Trooper Zigler activated his emergency lights, and before Defendant came to a stop on the side of the road. Officer Campbell concluded that the man operating the vehicle that Trooper Zigler was stopping was UM 9 and the same man that he previously heard on intercepted calls with Lewis. Although Officer Campbell could not testify that the voice was that of Defendant's (because he was not in the presence of Defendant when Defendant was speaking), Officer Campbell testified that based on the fact that he had listened to over fifty calls with UM 9, recognized the voice of the man he had identified as UM 9 as the man who alerted Lewis of the traffic stop, and that Trooper Zigler's stop of the Defendant happened at the same time that UM 9 told Lewis that he was being stopped, he concluded that UM 9 was Defendant.

**IV.    ANALYSIS**

In probation revocation hearings, a court must only find that a defendant violated a condition of his supervised release by a preponderance of the evidence, rather than beyond a reasonable doubt. 18 U.S.C. § 3583(e)(3); *see also Johnson v. United States*, 529 U.S. 694, 700 (2000) (noting that, even though such violations can lead to imprisonment, the violation need not be criminal). The Federal Rules of Evidence do not apply in supervised release revocation proceedings. *United States v. Frazier*, 26 F.3d 110, 114 (11th Cir. 1994). In weighing whether to admit hearsay testimony in a supervised release revocation proceeding, courts must "balance the defendant's right to confront adverse witnesses against the grounds asserted by the government for denying confrontation." *Id.* (citing *United States v. Penn*, 721 F.2d 762, 764 (11th Cir. 1983)). Based on the above testimony and the standard to be applied, the undersigned finds that Defendant violated the terms of his supervised release.

8

### A. Violations 1 and 2 Should Be Dismissed.

The parties agree that if Defendant violated his supervised release as to Violation 3, possession with intent to distribute cocaine, Violation 1 and 2 should be dismissed as lesser included offenses.[2] Indeed, trafficking in cocaine, as charged in Violation 1, is considered a lesser-included offense of possession with intent to sell cocaine. *See Gibbs v. State*, 698 So. 2d 1206, 1208–09 (Fla. 1997); *see also Driver v. State*, 288 So. 3d 716, 719 (Fla. 4th DCA 2020). Cocaine possession, as charged in Violation 2, is also a lesser-included offense of Violation 3. *See Wilcox v. State*, 675 So. 2d 1043 (Fla. 4th DCA 1996) (recognizing lesser-included offense of simple possession). Because the undersigned finds, for the reasons stated below, that the evidence amply supports a finding that Defendant possessed with the intent to sell cocaine as charged in Violation 3, Violation 1 and Violation 2 should be dismissed.

### B. Defendant Violated His Conditions Of Supervised Release By Possessing With The Intent Of Distributing Cocaine As Charged in Violation 3 Of The Petition.

To find that Defendant violated his conditions of supervised release as to Violation 3, the government must show, by a preponderance of evidence, that: (1) Defendant possessed with intent to sell a certain substance; (2) the substance was cocaine; and (3) Defendant had knowledge of the presence of the substance. Fla. Std. Jury Instr. (Crim) § 25.2 (2019). The government's evidence, by a preponderance, establishes that Defendant possessed the cocaine that was in the vehicle he was driving at the time of the traffic stop with the intent to sell it.

---

[2] Under Florida Law, the elements of trafficking in cocaine are that: (1) the defendant knowingly possessed a substance; (2) the substance was a mixture containing cocaine; and (3) the mixture containing cocaine weighed over 400 grams. Fla. Std. Jury Instr. (Crim) § 25.7(a) (2020). To prove the charge of cocaine possession, the government would have to show that: (1) a defendant possessed a controlled substance; and (2) the substance was cocaine. *Id*. A defendant possesses a controlled substance if he knows of the existence of the substance and intentionally exercises control over it. *Id.*

First, there should be no credible dispute that the substance at issue is cocaine. The substance was field tested at the site of the arrest and then was tested by a chemist in a laboratory where the results again confirmed that the substance was cocaine. Although Defendant does not concede that an appropriate chain of custody was maintained, ECF No. [56] at 4, the undersigned is unpersuaded by that argument. The testimony at the hearing established that the evidence was marked and secured and later tested by the chemist under protocols that ensure that there is no cross contamination with other evidence. In addition, the bags recovered on the scene and the bags that the chemist tested had the same distinctive Paw Patrol cartoon markings. As such, the evidence that the substance recovered was cocaine is strong and more than meets the government's burden.

Second, the undersigned finds that the government has met its burden that the cocaine was in Defendant's possession. The bags were located under the front passenger seat which was within the reach of the driver. Although there was no evidence presented that Defendant owned or had exclusive use of the vehicle, the surveillance confirmed that he was the only person in the vehicle that evening. Moreover, Officer Campbell testified that the intercepted calls between Lewis and Defendant earlier in the day showed the men discussing, in code, a half kilogram sale of cocaine. The Court credits Officer Campbell's testimony that, based on his experience, Lewis and Defendant were discussing the sale of a half kilogram of cocaine. As such, there is sufficient evidence to establish that the cocaine was in Defendant's possession.

Finally, in addition to the recorded call discussed above which is also evidence of intent to sell, the amount of cocaine seized and the manner in which it was packaged also supports the intent to sell. Detective Rivera testified that the amount of drugs seized was inconsistent with personal use and consistent with distribution. *See United States v. Thomas*, 676 F.2d 531, 535 (11th Cir. 1982) ("intent to distribute could reasonably have been inferred from the quantity of

cocaine found"); *see also Valentin v. State*, 974 So. 2d 629, 630 (Fla. 4th DCA 2008) (quantity of drugs may be circumstantial evidence of intent to sell if quantity is inconsistent with personal use). Moreover, the packaging of the drugs—marked with distinctive cartoons and bundled with samples—also supports the intent to sell. As to this element, the government has met its burden that the cocaine at issue was possessed with the intent to sell.

Defendant argues that the evidence is insufficient to established that Defendant was UM 9, the man that the investigation had identified as the supplier of the cocaine for the September 9, 2019 transaction. Specifically, Defendant argues that the cellular telephone he was in possession of on the night of his arrest had a 305-area code, while the intercepted calls between Lewis and UM 9 were with a telephone with a 321-area code. The telephone with the 321-area code was not recovered from Defendant or from the vehicle he was driving at the time of his arrest.

To be sure, evidence that the telephone in Defendant's possession at the time of his arrest matched the one identified as the one UM 9 was using would be highly incriminating. However, Officer Campbell's testimony, which the Court credits, was that the voice of the person he identified as the supplier of the cocaine from the call earlier in the day (as well as other calls) was the same voice of the person who alerted Lewis of the traffic stop.. Moreover, the call alerting Lewis of the stop was recorded at approximately the same time that Defendant was being stopped by Trooper Zigler. It would be highly unlikely that UM 9 was somewhere else being stopped at the same time and that the GPS system that identified the movement of UM 9 consistent with the movement of Defendant's vehicle would have also been incorrect. Although the fact that the cellular telephone with the 321-area code was not recovered is noted and not insignificant, it does not detract sufficiently from the remainder of the evidence.

Indeed, even if one were to assume that UM 9 was being stopped at the same time somewhere else, that the GPS information was incorrect, and that Defendant was not the person

on the earlier calls with Lewis, the evidence would still be sufficient to find that Defendant violated the terms of his supervised release. Defendant was stopped in a car with half of a kilogram of cocaine. The cocaine was within his reach, and therefore, within his possession. As the government notes, it is unlikely that cocaine in that amount and of that value would be in the car that Defendant was driving without his knowledge. Finally, the cocaine was of a quantity that supports a finding that it was for sale and not for personal use. Given that the standard is the preponderance of the evidence, the government would still meet its burden even if the undersigned discredited the evidence supporting the conclusion that Defendant was UM 9.

### C. As To Violation 4, The Government Has Not Met Its Burden.

The government advances the argument that two of the three small baggies found inside Defendant's car, one containing an unknown white powder and one containing an unknown brown powder, are drug paraphernalia. Drug paraphernalia, as defined by Florida Jury Instruction 25.14, includes "all equipment, products, and materials of any kind which are used, intended for use, or designed for use in . . . packaging, repackaging, storing, containing [and] transporting" a controlled substance. Fla. Std. Jury Instr. (Crim) § 25.14 (2020).

Although small plastic baggies are often used to package narcotics, that fact alone is not enough. There must be some evidence in the record to support a finding that *these* bags were intended for or being used to package narcotics, and therefore, were drug paraphernalia. At best, what the government proposes, by way of argument, is that because the substance inside them was *suspected* to be narcotics, the baggies are paraphernalia.[3] If the baggies had been empty the government's position might be stronger as it could have been inferred that the baggies were

---

[3] The government's reliance on *State v. McCray*, 561 So.2d 257, 259 (Fla. 1990), ECF No. [54] at 13–14, misses the point. The issue is not whether baggies that are not those that contained the charged narcotics can be paraphernalia. Plastic baggies can certainly be paraphernalia, the issue is whether on this evidence the Court can find that these two baggies were paraphernalia.

going to be used to package the recovered narcotics. The government did not present any testimony that would support to a finding that these baggies were being used to package narcotics. In fact, they contained an unknown substance that was not narcotics. As such, the undersigned finds that, on this record, there is not a preponderance of evidence to support a finding that the two small baggies were paraphernalia.

### V. RECOMMENDATION

Based on the foregoing, it is hereby **RECOMMENDED** that the District Court adopt the finding that Defendant violated his conditions of supervised release as alleged in Violation 3 of the Petition, revoke Defendant's supervised release, and hold a sentencing hearing to determine the appropriate disposition.

### VI. OBJECTIONS

Pursuant to Local Magistrate Rule 4(b) and Federal Rule of Civil Procedure 73, a party shall serve and file written objections, if any, to this Report and Recommendation with the United States District Court Judge for the Southern District of Florida, within **FOURTEEN DAYS** of being served with a copy of this Report and Recommendation. Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this Recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1 (2016); 28 U.S.C. § 636(b)(1)(C); *see also Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020).

DONE AND SUBMITTED in Chambers at Miami, Florida, this 17th day of December 2020.

_____
JACQUELINE BECERRA
UNITED STATES MAGISTRATE